IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Rhonda Covert

        Plaintiff

v.

Monroe County Department of Job and
Family Services

        Defendant.

Case No.: 2:08-CV-744

Judge Graham

Magistrate Judge Abel

OPINION AND ORDER

This matter is before the court on a motion for summary judgment, pursuant to Fed. R.

Civ. 56(c) filed by defendant Monroe County Department of Job and Family Services ("the

Department"). Plaintiff Rhonda Covert asserts claims for Title VII retaliation (Count I) and

retaliation in violation of Ohio Revised Code Chapter 4112 (Count II). The Department moves

for summary judgment on both Counts.

As set forth below, the court grants in part and denies in part the Department's motion.

## I.    FACTUAL BACKGROUND

Covert began working for the Department as a fraud investigator in May 2000. In 2003,

she was promoted to social worker, a position she held until her employment was terminated in

October, 2006. As a social worker, Covert's job duties included investigating allegations of

child abuse and/or neglect and taking appropriate action to maintain the safety of children in their

1

family situations.

Throughout Covert's employment with the Department, Vaughn Smith served as Department Director and Gary Truax served as Assistant Director. Truax also held the title of Social Service Supervisor for a portion of Covert's tenure, and in that capacity, Truax served as Covert's immediate supervisor. On July 23, 2006, Cassie Wells replaced Truax as Social Service Supervisor and thereby as Covert's immediate supervisor.

Covert describes her working relationship with Truax and Smith in a negative light. Beginning in approximately 2001, and continuing on and off throughout her employment with the Department, Covert claims that Smith and Truax subjected her to generally poor treatment. Covert attributes the start of this poor treatment to her participation in efforts to unionize the Department. Covert further testified that at some point, she became concerned with what she viewed to be Smith's disparate treatment of the Department's female employees.

Despite any tension between Covert and the Department's management, Covert received generally good or very good marks on her annual performance reviews for 2000 through 2004. Smith signed off on all of the reviews and Truax signed off on the 2004 review.

On October 25, 2005, Covert sent a letter to the EEOC. In the letter, Covert complained that Smith preferred to hire men and paid men higher salaries than woman. Covert accused Smith of "harassing, intimidating, and retaliating against female employees." There is no evidence that the EEOC received, let alone responded to, Covert's letter. There is also no indication that the Department or any of its other personnel were aware of the letter.

On March 9, 2006, Covert received a written performance evaluation for the period

2

covering July 2004 through March 2006[1], which had been prepared by Smith and Truax. In contrast to the earlier reviews, the March 9, 2006 review rated Covert's performance as either average or below average.[2]  Truax testified that his opinion of her job performance had changed, and specifically, that Covert "seemed less motivated to doing some of the work," "became uncommunicative with me as her supervisor," and "appeared not to complete some of the work as required by [Ohio law]." Despite receipt of this more negative review, Covert received pay raises for both 2005 and 2006.

Both Covert and her husband challenged her March 9 performance evaluation. Covert grieved the review and her husband complained about the review's content and timing at a meeting of the Monroe County Commissioners. The minutes from that meeting indicate that after an executive session, one of the Commissioners stated he would speak to Director Smith about employee evaluations.

On or about March 20, 2006, Covert filed a formal charge of discrimination with the Ohio Civil Rights Commission (OCRC) [hereinafter the "March charge"]. The charge alleged that the Department "denied her equal pay due to consideration of her sex, female." Pl. Ex. 25 at 7. In the body of the charge, Covert explained that Smith and Truax had provided preferential

---

1 The Department's Human Resource Officer, Michelle Speelman, explained that Department employees would not receive a separate 2005 review due to management's revision of the evaluation process during that time. Indeed, the 2006 review was presented in a different format than earlier reviews. The 2006 review form, for example, called for more extensive comments from reviewers.

2 The review praised Covert's willingness to work on the weekends, ability to work with children and foster families, and basic knowledge of rules and regulations, among other things, and criticized, among other things, absences during the week, interaction with biological parents, knowledge in technical areas of her job, failure to follow supervisor directives, ability to get along with new hires, compliance with agency policies.

treatment, in the form of higher pay and more opportunity for job advancement, to a male employee of the Department. The Department became aware of this charge in either May or June of 2006. See e.g., Pl. Ex. 5 at 1, 5, 9, 11. In August, 2007, the EEOC dismissed the March charge, explaining that it was "unable to conclude that the information obtained establishes a violation."

Beginning April 12, 2006 and concluding in late July, 2006, Covert took FMLA leave. She cited stress as the reason for the leave. During her absence, Covert's cases were assigned to another social worker, Cassie Wells.

On or about May 31, 2006, Covert filed a second charge of discrimination with the OCRC [hereinafter "the May charge"]. In the charging document, Covert accused the Department of retaliation and alleged that Smith and Truax "degraded" and "harassed' female employees and expressed a desire to be "rid of female employees." Two other Department employees, Christina Ward and Stephanie Caldwell, filed substantially similar, if not identical, charges on the same day. The Department filed a response to the charges in August, 2006. Truax testified that he was aware of both the March and May charges and that he felt like he was a target of the charges. He recalled discussing the charges with Smith, individuals in the County prosecutor's office, and legal counsel. The EEOC terminated its processing of the May charge and issued a notice of right to sue on that charge in February, 2007.

While Covert was on FMLA leave, the Department posted an internal job announcement, advertising an opening for "Social Services Supervisor."[3] The posting explained that the position

---

3 A similar posting had been made in May, 2005 and Covert had applied at that time. Smith ultimately withdrew the posting, explaining that it had not drawn a "good pool of applicants." Smith Dep. at 26-29.

required "a Bachelor's Degree in a human services related field or an [sic] Associates Degree in a human services related field" and "Two years of social work experience and/or…Five years of experience in management."

The Department's Human Resources Officer, Michelle Speelman, mailed a copy of the posting to Covert at home, explaining that she thought Covert might be interested in applying. Covert, Cassie Wells, and another Department employee, Ryan Wallace, applied for the position. The applicants were interviewed and evaluated by Smith and Speelman in late June, 2006. Truax sat in on the interviews, but did not complete an evaluation form for any of the applicants. Smith and Speelman rated the applicants' answers to a set of identical questions and on other dimensions, including overall attitude and experience. Covert received the lowest interview score and Wells received the highest.

On or about July 17, 2006, Speelman and Smith recommended Wells to fill the position based on her performance during the interview, her receipt of an associate's degree, her current pursuit of a bachelor's degree, and her more than six years of supervisory experience. See July 17, 2006 Recommendation & Scoring Sheet, Pl. Ex. 33. Wells was thereafter appointed supervisor; however, she was terminated from the position in 2007 when it became clear to the then-Director of the Department that Wells had misrepresented her receipt of an associate's degree. Wells asserts, however, that Truax "knew I had not obtained my Associate's Degree at the time of [my] interview." Wells Affidavit, Pl. Ex. 10. Truax disputes this, claiming that he did not learn of Wells' misrepresentation until 2007.

Additionally, Wells and Wallace also attest that before their interviews Truax provided

5

them with a list of social service acronyms and told them to "learn the list for the interview." Wallace Affidavit, Pl. Ex. 11; see also Wells Affidavit. "[T]he list of acronyms [sic] were asked as part of [the] interview[s]." Id. Truax initially stated this accusation was "not true," but later admitted that it was possible that he had spoken to Wells and Wallace at some point about the acronyms and their definitions. See Truax Dep. at 136.

On or about August 3, 2006, Covert received a "Record of an Oral Warning" for failing to timely sign and return her "Receipt of Personnel Manual" form. The warning was signed by Speelman. See Pl. Ex. 4k.[4]

In late August, 2006, Truax notified Covert that the grievance she had filed regarding her March 9, 2006 performance review was being dismissed because Covert had failed to attend a meeting regarding that grievance.[5]

---

4 Covert's entire disciplinary history prior to receipt of this warning consisted of her receipt of a written warning in 2002 for excessive personal internet use. That warning had been issued by Smith.

5 Between approximately April, 2006 and August, 2006 Truax and Covert communicated via e-mail regarding the grievance. Truax suggested scheduling a meeting to discuss the grievance on April 4, but Covert responded that she was unavailable on that date due to a work-related conflict, and that she would "get back to him" with a convenient time and date to meet. Truax sent Covert a "reminder" email on July 17, asking her to advise when she would be available to meet regarding the grievance. Covert returned to work on or about July 29; however, the record does not contain evidence that Covert responded to Truax as she said she would in April or in response to his July 17 e-mail.

On August 3, 2006, Truax advised Covert via e-mail that he had tentatively scheduled her grievance meeting for August 8, 2006 at 8:00 a.m. Covert responded the next day, stating only that she was still waiting for Truax to tell her whether the meeting would encompass steps 1 and 2 of the Department's grievance procedure. On August 7, Truax responded that, yes, the meeting would encompass both step 1 and step 2. Covert responded the same day, stating that she could not meet on August 8 because Truax needed to first provide her with "[d]etails on the grievance because it has been months since I filed [sic] them." She continued, "[o]nce I get details from you I will then have to contact my attorney for legal [sic] advise."

On September 10, 2006, Covert was involved in an off-duty traffic accident.[6]  The police
report documenting the accident, which was filed on September 12, 2006, explained that Covert
drove her car off of the road and into a mailbox post.  After striking the post, Covert continued
operating her car through a private driveway.  She then attempted to do a u-turn, but her car
instead became stuck in a ditch.  See Pl. Ex. 7, at 26.  The officer who completed the report
concluded that Covert was likely "under the influence of medications/drugs/alcohol" at the time
of the accident.  Id. at 34.[7]  On September 14, 2006, Covert was ticketed for "OMVI", "physical
control," and willful or wanton operation" in connection with the accident.  Id. at 19.8 In 2007,
Covert pled guilty to the "physical control" charge.

The same day she was ticketed, Covert received a "Notice of Pre-Disciplinary Meeting"
from the Department and a letter informing her that the Department had placed her on
"[a]dministrative [l]eave with pay until further notice."  Pl. Ex. 9.  Both documents were signed
by Smith.  The Notice of Pre-Disciplinary Meeting listed twenty disciplinary charges which had

---

On August 23, Truax informed Covert that the grievance related to alleged retaliation and her
March evaluation. He further stated, "the matter shall be held at 8:00am on August 25.  Your
failure to appear will indicate your desire to dismiss this matter."  Covert objected to the
scheduled date, stating that she had a court hearing schedule for 9:00 am on August 25 and that
two days notice was insufficient given that Truax had taken more than two weeks to respond to
her previous e-mail.

6Although this accident occurred outside of work hours, Covert testified that she was required to
drive both her own car and Department-issued cars for work-related purposes.  See Covert Dep. at
30.

7 During her deposition, Covert confirmed that she was in fact under the influence of alcohol at
the time of the accident.  See Covert. Dep. at 31.

8 Covert alleges that the Department somehow obtained a copy of the ticket.  See Covert Dep. at
31.

been lodged against Covert. The Notice explained that Covert would "be afforded a pre-disciplinary meeting....with Director Vaughn J. Smith or his designee" and that the purpose of the meeting would be "to explain the charges against [Covert] and to permit [Covert] the opportunity to respond to the charges." On or about September 26, 2006, Covert received an "Amended Notice of Pre-Disciplinary Meeting." The Amended Notice cited the original twenty disciplinary charges plus two additional charges and set September 29, 2006 as the date for the pre-disciplinary meeting. The Amended Notice was otherwise identical to the first Notice. Truax testified that he compiled information that was used to draft the Notices. See Truax Dep. at 39-41; Pl. Ex. 10. Covert testified that on the advice of counsel she chose not to attend the September 29, 2006 pre-disciplinary meeting or to otherwise respond to the Notice or Amended Notice.

Smith thereafter recommended Covert's termination to the Monroe County Board of Commissioners. (Pursuant to the Department's Policies and Procedures manual, termination of an employee required the Commissioners' approval.) The evidence Truax compiled for use in preparing the Notice and Amended Notice was used as part of a presentation to the Board in support of the recommendation to terminate Covert. Traux Dep. at 39-41.

On October 2, 2006, Covert was sent an "Order of Removal," which informed her that her employment with the Department was terminated effective October 4, 2006. The Order stated that the grounds for removal were "[m]isfeasance, malfeasance, nonfeasance in office, insubordination and other failure of good behavior; specifically: [f]alsification of records, failure to meet required timelines in initiating or completing investigations, inappropriate remarks to a client during an investigation and other failure of good behavior as listed in the amended notice

8

of pre-disciplinary meeting." The Order was signed by the three County Commissioners and

Smith. On the advice of counsel, Plaintiff chose not to appeal her termination to the State

Personnel Board of Review. See Covert Dep. at 98.

On December 20, 2006, Covert filed a charge alleging retaliatory discharge with the

OCRC and EEOC. The EEOC issued a right to sue letter with regard to that charge on May 6,

2008. This lawsuit followed.

## II.     LEGAL STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." See LaPointe v.

United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993); Osborn v. Ashland County Bd.

of Alcohol, Drug Addiction & Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir. 1992)(per

curium). The party that moves for summary judgment has the burden of showing that there are

no genuine issues of material fact in the case at issue, LaPointe, 8 F.3d at 378, which may be

accomplished by pointing out to the court that the nonmoving party lacks evidence to support an

essential element of its case. Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382,

1389 (6th Cir. 1993). In response, the nonmoving party must present "significant probative

evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material

facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993). "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); see

generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989).

In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993)(quoting Anderson, 477 U.S. at 251-52). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. See also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## III. ANALYSIS

### A. Count I. Title VII Retaliation

"The 1964 Civil Rights Act protects from retaliation employees who have opposed discriminatory employment practices." Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007) (citing 42 U.S.C. § 2000e-3(a) (2006)). Courts analyzing retaliation claims apply the McDonnell Douglas/Burdine framework of shifting burdens of production and proof. Id. (citing Harrison v. Metro. Gov't of Nashville and Davidson County, Tennessee, 80 F.3d 1107, 1118 (6th Cir. 1996)). In order to make out a prima facie case of retaliation, a plaintiff must establish that: (1) he or she

10

engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took materially adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000); see also Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 67-68 (2006) (modifying the third element to require materially adverse action rather than adverse employment action). The Sixth Circuit has observed that a plaintiff "easily" makes out a prima facie case of retaliation. McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd., 440 F.3d 320, 335 (6th Cir. 2006)(citation omitted).

If the plaintiff establishes a prima facie case, "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason'" for the adverse action. Morris, 201 F.3d at 792-93 (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)); see Upshaw v. Ford Motor Co., 576 F.3d 576, 589 (6th Cir. 2009)(the employer's burden at this stage is merely one of production, not persuasion, and it does not involve a credibility assessment).

If the defendant satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate "that the proffered reason was not the true reason for the employment decision." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981); see also Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 523 (6th Cir. 2008).

### *1.    Prima Facie Case – Elements One and Two*

In an attempt to satisfy the first element, Covert directs the court to: (1) the informal complaint letter she mailed to the EEOC on or about October 25, 2005; (2) the March charge; and

11

(3) the May charge. See Plaintiff's Memorandum in Opposition at 18-19. The Department does not dispute that such activities may constitute "protected activities," but instead argues that Covert cannot rely upon the October 25 letter and the March charge because only the May charge is alleged in the Complaint and only that charge was "addressed throughout the discovery period initially set by the Court." Defendant's Reply at 1.[9]

The court need not address the Department's argument with regard to Covert's October 25, 2005 letter because, as indicated above, Covert has not introduced evidence demonstrating that the Department knew that she had sent this letter (i.e., evidence establishing the second element of the prima facie case). See Morris, 201 F.3d at 792 (holding that in order to prove a prima facie case of Title VII retaliation, plaintiff must establish that the exercise of protected rights was known to the defendant); see also Harris v. Butler Co., No. 08-4318, 344 Fed.App.195, 199-200 (6th Cir. Aug. 27, 2009)("we need not decide whether [Plaintiff] has satisfied the second prong of his claim of employment-based retaliation because the third element is dispositive").

The court next finds that Covert's failure to specifically reference the March charge in her complaint is not fatal to her argument here that the March charge constitutes a protected activity. The Rules of Civil Procedure require only that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). And as the Supreme Court recently stated, "'detailed factual allegations' are not required." Ashcroft v. Iqbal,

_____

9 For the same reason, the Department makes the following request in its reply brief: that "all references in Plaintiff's Memorandum Contra, and supporting documentation, that address matters occurring before May 31, 2006 be stricken from the record and disregarded." Defendant's Reply at 10. The Department's request is overly broad and will be denied. Even if the court agreed with the Department that the allegations in the complaint limit Covert to the May 31, 2006 protected activity, this fact in and of itself does not automatically render every pre-May 31 reference or document irrelevant to the court's consideration of this matter.

12

129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 555). Additionally, the court notes

that the language in Covert's complaint does not foreclose the possibility of earlier-occurring

protected activity. The complaint states, in pertinent part, "[a]t least partially in response to

Plaintiff's Charge of Discrimination filed on or about May 31, 2006, Defendant harassed Plaintiff,

gave unduly harsh performance reviews to Plaintiff, denied Plaintiff a promotion for which she was

the most qualified candidate, and later discharged Plaintiff for pretextual reasons." Pl. Complaint

at ¶ 8 (emphasis added); cf. Schlosser v. Westinghouse Electric Co., No. 4:00CV205-DJS, 2001

WL 1746574, *2 (E.D.Mo. Dec. 18, 2001) (dismissing defendant's argument that plaintiff was

bound by the statement in her pleadings that her charge was filed on August 2, 1999 after noting

that "[p]laintiff does not renege on the accuracy of this averment so much as argue that additional

earlier conduct also either constitutes the filing of a charge or qualifies for equitable tolling of the

statute of limitations for the filing of a charge").

The Department also argues generally that only the May charge was "addressed throughout

the discovery period initially set by the Court," but the court notes that in her deposition, Covert

testified that she filed more than one charge of discrimination. See Covert Dep. at 16. The

Department has not directed the court to any admission by Covert that her lawsuit is based solely

on the May protected activity.

Based on the above, the court concludes that Covert's filing of the March and May

activities constitute protected activities.

Turning to the second prima facie element, Covert has introduced evidence demonstrating

that the Department generally, and Smith and Truax specifically, knew that she filed the March and

13

May charges.  See e.g., Truax Dep., pgs. 26-27 (testifying that "at the time," he was aware of both

charges and discussed both charges with Smith, the County Prosecutor, and private counsel); May

17, 2006 Letter from OCRC to Covert regarding March charge, Pl. Ex. 5 ("The company has been

notified of the charge and a request made for a response to the allegations."); Department response

to Covert's March charge, Pl. Ex. 5 (stating that the Department had received a copy of the March

charge in June, 2006); Department's response to Covert's May charge, dated August, 2006, Pl. Ex.

5.  The court therefore finds the second prima facie element established.

### 2.     *Prima Facie Case – Element Three*

A materially adverse action in the retaliation context[10] is any action that "well might have

dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington

Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006)(internal citation and quotation omitted).

 Whether an action is materially adverse depends on the circumstances surrounding the action.  Id.

at 68-69.  The Court cautioned that "it is important to separate significant from trivial harms" and

stated that "[a]n employee's decision to report discriminatory behavior cannot immunize that

employee from those petty slights or minor annoyances that often take place at work and that all

employees experience."  Id. at 68.

In the wake of Burlington Northern, the Sixth Circuit has held that certain actions (i.e.

denial of a lateral transfer and bad employment evaluations) did not rise to the level of materially

---

10 A plaintiff's burden of establishing an adverse action is less onerous in the retaliation context
than in the anti-discrimination context.  Burlington Northern, 548 U.S. at 67-68.  Prior to
Burlington Northern, many circuit courts, including the Sixth Circuit, applied the same standard for
retaliation that they applied to a substantive discrimination offense when defining the "level of
seriousness to which harm must rise before it becomes actionable retaliation."  Id. at 60, 66-67.

adverse actions because they did not "significantly impact [plaintiff's] professional advancement and would not have dissuaded a reasonable person from filing a Title VII claim." James v. Metropolitan Gov't of Nashville, No. 04- 5874, 243 F. Appx. 74, 79 (6th Cir. 2007).

Here, Covert asserts that each of the following constitute materially adverse actions: (1) her termination, (2) the Department's decision not to promote her to Social Services Supervisor, (3) the poor evaluation she received on March 9, 2006, (4) the Department's placement of her on administrative leave with pay; (5) her receipt the August 3, 2006 oral warning; (6) Truax's dismissal of her performance evaluation-related grievance, and (7) Smith's comment during a meeting of the County Commissioners that Covert's apparent failure to understand and/or to follow the Department's formal grievance process was evidence of her "shoddy work". See Plaintiff's Memorandum in Opposition at 18.[11]

The Department does not dispute that Covert's termination and denial of promotion constitute materially adverse actions and indeed, the Sixth Circuit has found that such acts satisfy the Burlington Northern standard. See e.g., Lindsay v. Yates, 578 F.3d 407, 418 (6th Cir. 2009) (termination); Plumb v. Potter, No. 06-1017, 212 Fed.Appx. 472,483 (6th Cir. Jan. 5, 2007) (denial of promotion).

As stated above, a markedly worse performance evaluation can constitute a materially

---

[11]During her deposition, Covert testified that Truax also retaliated against her by scheduling her to visit a client's home at 4:00pm on a work day. Covert suggested that Truax did this in an effort to force her to work late and/or to miss a personal appointment she had scheduled for 4:45pm that day. The Department argued in its motion for summary judgment that Truax's alleged action "fails to rise to the level of an adverse employment action" and in her opposition brief Covert failed to respond. The court therefore concludes that Covert has abandoned her argument with regard to Truax's scheduling of this home visit. See e.g., Palmer v. Marion County, 327 F.3d 588, 597-98 (7th Cir. 2003) (claims not addressed in summary judgment opposition deemed abandoned).

15

adverse action provided the evaluation actually impacted the recipient's professional advancement and/or wages. See James, 243 F. Appx. at 79. This court need not address the question of whether Covert's March 9, 2006 evaluation impacted her professional advancement and/or wages, however, because Covert received that evaluation eleven days before she filed her first charge with the OCRC, the March charge. Given this timing, the March 9 evaluation cannot, by definition, serve as the basis of Covert's retaliation clam. See Butler v. Cooper Standard Automotive, Inc., No. 09-3349, 2010 WL 1741110, *8 (6th Cir. April 30, 2010) ("Because these employment actions were taken prior to [Plaintiff's] initial complaints of race discrimination, they cannot serve as the basis for a retaliation claim, regardless of whether these events actually constituted 'adverse employment actions.'").

In support of her argument that her placement on paid administrative constitutes a materially adverse action, Covert directs the court to Michael v Caterpillar Financial Services Corp., 496 F.3d 584 (6th Cir. 2007). In Michael, the Sixth Circuit concluded that the adverse actions plaintiff alleged, a two-day placement on paid administrative leave followed immediately by a "90-day performance plan, "appear[ed] to meet [the] relatively low bar" set by Burlington Northern. Id. at 596. Like the plaintiff in Michael, Covert has shown that she was placed on a period of paid administrative leave (a period that actually exceeded the two-day leave at issue in Michael), which was followed immediately by further adverse employment action, in Covert's case, termination. Pursuant to Michael, the court finds that Covert has satisfied the third element of her prima facie case with regard to her administrative leave claim.[12]

---

12 In support of its position that paid administrative leave is not a materially adverse action, the Department cites to three Sixth Circuit decisions. See Defendant's Response Brief at 1-2. Two of these cases, Peltier v. U.S., 388 F.3d 984 (6th Cir. 2004) and Jackson v. City of Columbus, 194

Covert also seeks to establish a prima facie retaliation case regarding the warning she received in 2006 for failing to timely sign and return her receipt of policy manual form. Covert has produced no evidence demonstrating that receipt of this warning "significantly impacted [Covert's] professional advancement," James, 243 F. Appx. at 79, and the court finds that it does not constitute a materially adverse action. See Mendoza v. AutoZone, Inc., No. 3:08CV2321, 2010 WL 1956549, *14 (N.D. Ohio May 14, 2010) (finding plaintiff's receipt of verbal reprimands did not constitute materially adverse action where plaintiff failed to produce evidence of any injury or harm produced by the reprimands).

Similarly, Covert has not established that Truax's dismissal of her performance evaluation-related grievance "significantly impacted [her] professional advancement". James, 243 F. Appx. at 79. The court therefore finds that Covert cannot make out a prima facie retaliation case because this is not a materially adverse action.

Covert also cannot establish a prima facie retaliation case regarding Smith's alleged "shoddy work" statement. Covert has not shown that Smith's statement had any impact, let alone a "significant[] impact," on her professional advancement. Id.

### 3. *Prima Facie Case – Element Four*

The Court now considers the causal connection, if any, between Covert's protected activity

---

F.3d 737 (6th Cir. 1999), were decided before the Supreme Court's decision in Burlington Northern and thus, before the Supreme Court clarified that the definition of adverse action in the retaliation context is more liberal than its counterpart in the discrimination context. This more liberal definition permits actions not adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context. The third case, Scott v. Metropolitan Health Corp., Nos. 05-1948, 05-2642, 06-1122, 06-1652, 234 Fed. Appx. 341 (6th Cir. April 3, 2007), relies solely upon a pre-Burlington Northern decision (i.e., Peltier) in concluding that placement of plaintiff on paid leave pending investigation did not constitute an adverse employment action for purposes of bringing a False Claims Act retaliation claim.

and the Department's materially adverse actions.

To demonstrate a causal connection between a materially adverse action and the exercise of

and the Department's materially adverse actions.

To demonstrate a causal connection between a materially adverse action and the exercise of protected rights, "a plaintiff must proffer evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action." Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007)(quotation omitted). The burden of establishing causation is not onerous, but it does rest on the plaintiff. See Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th 2000).

The Sixth Circuit has held that in rare circumstances, temporal proximity may be enough to establish an inference of causation. See e.g., Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 525 (6th Cir.2008); see also, Smith v. City of Salem, 378 F.3d 566, 571 (6th Cir.2004) (4-6 day interval without more was sufficient to establish an inference of causation); Mickey, 516 F.3d at 525 (same day); De Carlo v. Potter, 358 F.3d 408, 421 (6th Cir.2004) (13-day interval); Asmo v. Keane, Inc., 471 F.3d 588, 593 (6th Cir.2006) (two-month interval); Goller v. Ohio Department of Rehabilitation & Correction, 2008 WL 2796080 (6th Cir.2008) (two-month interval); Sinfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563 (6th Cir.2004) (three-month interval). However, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." Mickey, 516 F.3d at 525; see also Cooper v. City of N. Olmstead, 795 F.2d 1265, 1272 (6th Cir.1986) (four-month interval insufficient).

"Beyond temporal proximity, other indicia of retaliatory conduct would include evidence that the plaintiff was treated differently, either less positively or more negatively, than similarly situated employees who had not exercised Title VII rights, or evidence that the plaintiff was subjected to closer disciplinary scrutiny after exercising Title VII rights." Evans v. Prospect

18

Airport Servs., Inc., No. 07-5303, 286 Fed.Appx. 889, 895 (6th Cir. 2008)(citations and quotations omitted).

a.    <b>Termination</b>

In support of its argument that Covert cannot establish the requisite causal connection between her protected activity and her termination, the Department states, "the facts reveal that [Covert] was terminated for misconduct, not for filing a charge of discrimination." Defendant's Reply at 3. However, a "[d]efendant cannot rely on its articulated reason for the adverse action [here, employee misconduct] to argue that plaintiff does not meet the causal connection element of the prima facie test." Lowe v. Hamilton County Job & Family Services, No. 1:05cv117, 2009 WL 818960, *14 (S.D.Ohio Mar. 27, 2009) (citing Gribcheck v. Runyon, 245 F.3d 547, 551 (6th Cir. 2001) (where the district court looked ahead to the incident leading to the plaintiff's termination in examining whether the causal connection prong of a prima facie case was satisfied, the Sixth Circuit held that the district court impermissibly "jumped ahead in the McDonnell Douglas framework."))

The Department also incorrectly argues that a causal connection cannot be established because the County Commissioners, who are not accused of engaging in retaliatory behavior, played an equal part in Covert's termination. See e.g., Lee v. New Mexico State University Bd. of Regents, 102 F.Supp.2d 1265, 1280 (D.N.M. 2000) (dismissing defendants' argument that all of the faculty members involved in denying plaintiff tenure would have to possess retaliatory motive in order for plaintiff to prove pretext and withstand summary judgment on her retaliation claim). The Department's argument ignores the evidence in the record which links Smith and Truax, who are accused of engaging in retaliatory behavior, with the decision to terminate Covert. Cf. Rizzo v.

19

Sheahan, 266 F.3d 705, 715-716 (7th Cir. 2001) (affirming summary judgment to employer on employee's Title VII retaliation claim where, among other things, employee failed to provide evidence linking county officials who allegedly threatened that she would lose her job if she did not withdraw sexual harassment complaint to the County Merit Board's decision to terminate her). The evidence demonstrates that the County Commissioners only agreed to sign the final Order of Removal after receiving Smith's recommendation that Covert be terminated and after hearing Smith and Truax's presentation in support of that recommendation. See e.g., Arendale v. City of Memphis, 519 F.3d 587, 604 n.13 (6th Cir. 2008) ("When an adverse...decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' ... theory of liability."). Notably, there is no evidence that the Commissioners engaged in any type of independent investigation into the circumstances surrounding Covert's alleged misconduct. See e.g., Lee, 102 F.Supp.2d at 1280 (denying defendants' argument that all faculty members involved in denying plaintiff tenure would have to possess retaliatory motive in order for plaintiff to prove pretext where it was clear that "the negative tenure recommendation of [one faculty member] had repercussions throughout the entire tenure process and tainted plaintiff's application" and that "the concerns voiced...were essentially ratified by the remainder of the tenure review faculty, without scrutiny of the factual basis underlying the negative assessment of plaintiff's qualifications") ; cf. Wilson v. Stroh Companies, Inc., 952 F.2d 942, 946 (6th Cir. 1992) (holding that a direct supervisor's racial animus could not be imputed to a manager who made the ultimate termination decision when the supervisor reported the incident in question but the termination decision was based on management's independent investigation). And of course,

20

Smith's involvement was not limited to exerting indirect influence; rather, Smith also joined in the ultimate termination decision.

Next, the Department contends that Covert's attempt at showing causation must fail as it focuses solely on temporal proximity. Where, as here, four months passes between the protected activity and materially adverse action, the Sixth Circuit has found that temporal proximity alone cannot establish causation. Cooper, 795 F.2d at 1272-73. Covert has introduced more than temporal proximity in support of her causation argument, however. Covert alleges she was subjected to a "pattern of retaliation by [the Department]…which heightened in response to OCRC charges she filed." Plaintiff's Memorandum in Opposition at 18. For example, Covert points out that her disciplinary history prior to May 2006 included the receipt of a single warning, and yet, in the four months following the OCRC charges, Covert received another warning, was placed on administrative leave, and was ultimately terminated. Covert has also introduced evidence demonstrating that after she filed OCRC charges (charges that targeted Smith and Truax), Smith instructed Truax to investigate her behavior and prepare a report of infractions to use against her. See e.g., Truax Dep. at 51-53. During his deposition, Truax did not dispute that Smith had instructed him to investigate Covert's conduct nor did he dispute that he compiled information that was ultimately used to put together the Notice and Amended Notice of Pre-Disciplinary Meeting and to present to the Commissioners in support of the recommendation that Covert be fired. Id. In its briefs, the Department suggests a non-retaliatory explanation for the "report of infractions" – namely, that the report originated from complaints made by other Department employees who were covering Covert's cases during her FMLA leave. Despite this explanation, however, the court finds that Covert has introduced sufficient evidence to create a genuine issue of material fact

21

regarding a causal connection between her protected conduct and her subsequent termination.

### b.     **Failure to Promote**

A little over one month passed between Covert's filing of the May 31 charge and the

Department's decision not to promote her to Social Services Supervisor.  In addition to this

temporal proximity is evidence which shows that Wells and Wallace, the other two candidates for

the position, were treated more favorably than Covert.  Wells and Wallace attested that Traux

provided them with a list of social services acronyms and instructed them to study the list in

advance of their interviews.  During their interviews, all three candidates were assigned numeric

scores based on their ability to define certain social services acronyms.  It is undisputed that Wells

and Wallace received numeric scores significantly higher than the score Covert received.

Additionally, there is evidence in the record, which, viewed in the light most favorable to Covert,

demonstrates that the Department promoted Wells despite Truax's knowledge that she had

misrepresented her educational background (i.e., that she had an associate's degree).  The court

finds that the above evidence is sufficient to satisfy the fourth element of the prima facie case with

regard to Covert's failure to promote claim.

### c.     **Placement on Administrative Leave with Pay**

The Sixth Circuit has found a three-month interval sufficient to establish causal connection,

see Sinfield, 389 F.3d at 563, but has found a four-month interval insufficient to establish such

connection, see Cooper, 795 F.2d at 1272-73.  In light of the fact that approximately three and a

half months elapsed between Covert's May 31 charge and the Department's placement of her on

administrative leave, the court turns to other indicia, if any, of retaliatory conduct.  Covert states

that "[t]he fact that Smith acted upon this incident on September 14, 2006 as the basis for Covert's

22

suspension on that date…is significant proof of defendant's discriminatory and retaliatory intent, and pretext, rather than a legitimate nonretaliatory grounds for discharge." Plaintiff's Memorandum in Opposition at 16. The court assumes that Covert's reference to "this incident on September 14, 2006" refers to the fact that Covert was ticketed on September 14, 2006 for "OMVI," "physical control," and "willful or wanton operation" in connection with an off-duty car accident which occurred on September 10, 2006. Covert seems to be suggesting that the fact that she was placed on administrative leave the same day that she received the ticket is evidence of retaliation. Covert has failed to demonstrate how this timing indicates retaliatory conduct. And moreover, she has not directed the court to other indicia of retaliatory conduct. The court therefore finds that Covert has failed to establish a prima facie case with regard to her administrative leave claim.

### 4.    *Defendant's Legitimate, Non-Discriminatory Reasons for Taking Adverse Actions*

The burden now shifts to the Department to articulate a legitimate, nondiscriminatory reason or reasons for terminating and failing to promote Covert.

#### a.    **Termination**

The Department contends that Covert was appropriately terminated "as a result of the [twenty-two instances of] misconduct set forth in the pre-disciplinary notice." Defendant's Motion for Summary Judgment at 1. In its motion, the Department focuses on three of those twenty-two instances of alleged misconduct in an attempt to show that Covert "was discharged for non-retaliatory reasons." Id. at 3.

First, the Department states that as of September 2006, Covert had not completed the

23

paperwork needed to memorialize a matching conference between a child and her prospective

adoptive family even though the conference had taken place some six or seven months earlier. The

paperwork in question consists of a 15-page form entitled "Documentation of the Placement

Decision-Making Process." The form is "designed to compile, for review and assessment, a

child's specific needs, in comparison to an individual family's characteristics and their ability to

meet the child's specific needs." Covert Dep. Ex. 10. The form is comprised of three parts. Part

one is intended to "document the pre-adoptive staffing" and "must be updated prior to each

matching conference." Id. Parts two and three of the form "shall be completed at each matching

conference." Id. The form at issue in this case is largely blank, the only exceptions being that it

identifies Covert as the "person completing [the form]," states the child's name, contains

signatures from individuals who participated in the "pre-adoptive staffing, " and lists names of the

names of the people invited to the matching conference. Id. No substantive information is set

forth in the form.

Second, the Department cites Covert's purported failure to timely respond to a call alleging

sexual abuse of two minors and provision of "inappropriate" sexual advice to one of the alleged

abuse victims. Social workers responding to alleged sexual abuse in situations such as the one

presented here are required to "attempt F2F (face-to-face) or Telephone contact in 24 hours with

[the] principal or collateral source to ensure child is safe." Department's "Report of Child Abuse

or Neglect" form, Covert Dep. Ex. 5; see also Covert Dep. at 81 (stating that social workers

responding to sexual abuse complaints are required to "contact a collateral source within 24 hours

by phone or by going to the home or them coming to the agency to ensure that the child is safe and

not around the alleged perpetrator"). The Department claims that Covert failed to make contact

within twenty-four hours.  Instead, the Department claims that the complaint was received on September 2, 2006 and Covert's first contact was a face-to-face conference on September 5, 2006. The Report of Child Abuse or Neglect form prepared by Covert in connection with this case states "F2F...@ agency 9-5-06 10:45 AM" in the space provided for indicating when contact was initiated.  Id; see also Covert Dep. at 81.

The Department also challenges advice given by Covert during her initial meeting with the abuse victim, D.J., a nine-year-old boy.  Covert's report memorializing the meeting, which she identified during her deposition[13], describes the alleged sexual abuse, which involved oral and anal sexual penetration between D.J. and another twelve-year-old boy.  Covert Dep. Ex. 5.  The report indicates that after hearing D.J.'s account of the alleged sexual abuse, Covert "explained to DJ that he was not in trouble but that he was too young to be doing things like this.  DJ wanted to know how old he could be before he could do this (with a girl of course)[.]  I stated to DJ that if he turns 13 or older and has a girlfriend the same age and she consents he could at that time."  Id.

The third alleged incident of misconduct the Department points to is Covert's September 10, 2006 car accident.  The Department states, "[a]though the accident was off-duty, Plaintiff acknowledges routinely driving both her own car and an agency car for business purposes, to include the transport of children. (Plaintiff Depo. at 27).  As such, Plaintiff's off-duty accident, wherein she was admittedly under the influence of alcohol, was clearly business related and forms a separate basis for termination, non-related to her charges of discrimination." Department's Motion for Summary Judgment at 5.

The Department's "Personnel Policies and Procedures Manual" provides that employees

_____

13 During her deposition, Covert was asked whether the report was "an accurate summary of the

25

may be "removed from their job for: [i]ncompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, violation of state or federal law, violation of work rules,...or any other failure of behavior." The Policy also states that although the Department generally "adheres to the principles of progressive discipline....[c]ertain offenses are serious enough to warrant immediate removal without regard to previous reprimands or discipline." As the court has noted, the Department's "burden is merely one of production, not persuasion, and it does not involve a credibility assessment." Upshaw, 576 F.3d at 589. As discussed below, the Department's explanations for Covert's termination meet this burden.

### b.     Failure to Promote

The Department also argues that it has articulated a legitimate, non-discriminatory reason for promoting Wells as opposed to Covert; namely, that Wells was the more qualified candidate. See Department's Motion for Summary Judgment at 6; Department's Reply at 3. The "Recommendation & Scoring Sheet" signed by Smith and Speelman recommends Wells for the Social Service Supervisor position because she received the highest interview score of the three candidates, "has over six (6) years of Supervisory experience, and "has an [sic] Associates Degree...and is...in pursuit of a Bachelor of Science Degree." While Covert also possessed an associate's degree and was pursuing a bachelor's degree, she did not have supervisory experience and received the lowest interview score. The court finds that the Department has satisfied its burden with regard to Covert's failure to promote claim. See Williams v. Columbus Metro.

---

conversation that [she] had with DJ?" Covert Dep. at 83. Covert replied that it was. Id.

26

Housing Auth., No. 02-3930, 90 Fed Appx. 870, 873 (6th Cir.2004)(hiring qualified candidates is legitimate, non-discriminatory reason for failing to promote).

### 5.    *Pretext*

To show pretext, a plaintiff must produce evidence that either the employer's stated reason: (1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) was insufficient to explain the challenged conduct. Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir.1994). The plaintiff must produce "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him [or her]." Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir.2003). If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous. See Sybrandt v. Home Depot, U.S.A., Inc., 560 F.3d 553, 559 (6th Cir.2009) (quoting Majewski v. Auto. Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir.2001)).

### a.    **Termination**

Covert argues that the jury could reasonably reject each of the reasons the Department articulated for terminating her. The court disagrees for the following reasons.

### 1.    **Failure to complete matching conference form**

With regard to the alleged failure to complete the matching conference form, Covert focuses on the first prong of the Manzer test. See Plaintiff's Memorandum in Opposition at 7-8 (citing testimony from the foster parents and guardian ad litem who attended the conference that the form was completed before they signed it). However, Covert misapplies this prong in arguing

27

that she did, in fact, complete the form.   It is well settled that to establish pretext, a "plaintiff must

allege more than a dispute over the facts upon which [the materially adverse action] was based.

[She] must put forth evidence which demonstrates that the employer did not honestly believe in the

proffered non-discriminatory reason for its adverse action."  Braithwaite v. Timken Co., 258 F.3d

488, 493-94 (6th Cir. 2001) (internal quotation omitted.)  In Braithwaite, the Sixth Circuit further

explained:

> In deciding whether an employer reasonably relied on the
> particularized facts then before it, we do not require that the decisional
> process used by the employer be optimal or that it left no stone unturned.
> Rather, the key inquiry is whether the employer made a reasonably
> informed and considered decision before taking an adverse employment
> action.
>
> If there is no material dispute that the employer made a "reasonably
> informed and considered decision" that demonstrates an "honest belief" in
> the proffered reason for the adverse employment action, the case should be
> dismissed since no reasonable juror could find that the employer's adverse
> employment action was pretextual.

Id. at 494 (internal citation omitted) (quoting Smith v. Chrysler Corp., 155 F.3d at 799, 807
(6th Cir. 1998)).


There is no presence here of a material dispute over whether Smith and the Commissioners

made a reasonably informed and considered decision that demonstrated an honest belief in the

proffered reason for Covert's termination.  In fact, Covert essentially ignores the issue.  And, the

evidence indicates that at the time Covert was terminated, Smith and the Commissioners had only

evidence indicating Covert had not completed the form before them.  As noted above, the

"Documentation of the Placement Decision-Making Process" form intended to memorialize the

conference was almost entirely blank despite the requirement that part one of the form be

completed before the conference and that parts two and three be completed at the conference.

Moreover, Covert acknowledged that she chose not to respond to any of the twenty-two disciplinary charges against her, including the charge accusing her of failure to document the matching conference. The court therefore holds that Covert has failed to demonstrate that the Department's first reason for discharging her had no basis in fact. Cf. Chandler v. Potter, No. C-1-04-486, 2006 W 143272, *4 (S.D. Ohio Jan. 18, 2006) (plaintiff who was discharged for threatening a co-worker could not demonstrate that this non-retaliatory reason was not "based in fact" where the evidence indicated that at the time the decision to discharge was made, the decision-maker had before her only testimony indicating that plaintiff had made the threats and plaintiff acknowledged that she "would not answer [the decision-maker's] questions unless they were submitted to her in writing and she could then forward the answers to [the decision-maker] through her attorney").

Covert also contends that failure to complete the matching conference form was insufficient to motivate her termination (the third Manzer prong) because the Department failed to apply its progressive discipline policy uniformly. See Plaintiff's Memorandum in Opposition at 17 and n. 11.[14] A terminated employee may show that an employer's stated reason for a retaliatory discharge was insufficient to motivate termination by producing evidence that other similarly-situated employees "were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." Lamer v. Metadyne, Co., No. 06-3555, 240 Fed. Appx. 22, 31 (6th Cir. 2007). Covert directs the court to Christina Ward and Ruth Shreve– two co-workers who Covert claims were similarly situated and to whom "Mr.

---

14 To the extent Covert argues that the Department's policy mandated issuance of a warning as opposed to discharge, the court notes that although the policy provides for general adherence to principles of progressive discipline, it also specifies that "[c]ertain offenses are serious enough to

Smith repeatedly issued verbal warnings and warning letters instead of discharge." Plaintiff's Memorandum in Opposition at 17, n. 11.

Before the court considers the specific misconduct for which Ward and Shreve were disciplined, it notes that Ward and Shreve are importantly distinguishable from Covert in that neither Ward nor Shreve had twenty-two total charges of misconduct lodged against them at the time they were disciplined.

Turning specifically to Ward, the court concludes that Ward and Covert are not similarly situated because the misconduct for which they were disciplined was not comparable. The evidence indicates that Ward received four warnings: one in August, 2005 for submitting an FMLA form 10 days past the deadline; one in September, 2005 for violating the Department's policy regarding making personal telephone calls at work; one in October, 2005 for claiming 15 minutes overtime when in fact the time appeared to have been spent socializing rather than working; and one in February, 2006 for failure to timely prepare a requisition form as requested by Smith. See Pl. Ex. 34. Whereas Covert's misconduct (i.e., her failure to memorialize a meeting between a child and his or her prospective family) is directed at the Department's core mission, Ward's misconduct is administrative in nature. See e.g., Palmer v. Potter, No. 02-6549, 97 Fed.Appx. 522, 525 (6th Cir. April 14, 2004) (holding that a "qualitative difference in conduct renders futile any attempt to [demonstrate that two individuals are] 'similarly situated'").

Also, given Covert's overarching contention in this suit that the Department is guilty of terminating its employees (such as Covert) in retaliation for their having filed charges of discrimination against the Department, it is noteworthy that the Department did not terminate

---

warrant immediate removal without regard to previous reprimands or discipline."

Ward – a Department employee who like Covert filed a charge of discrimination against the Department.  See Pl. Ex. 34, at 1.

Covert has also failed to direct the court to evidence demonstrating that she and Ruth Shreve were similarly situated.  For example, Covert directs the court to a written warning Shreve received in May, 2005 for failure to properly handle, document, and report a telephone call.  This written warning cannot serve as a basis for comparison, however, because it was not issued by Smith or Truax (who participated in the decision to terminate Covert), but by a different member of the Department's management (i.e., William Frank).  See e.g., E.E.O.C. v. Memphis Goodwill Industries Inc., 675 F.Supp.2d 846, 853 (W.D.Tenn.,2009) (observing that generally in cases alleging disparate disciplinary action, the individual with whom the plaintiff seeks to compare her treatment must have dealt with the same decision-maker, e.g., supervisor).  The evidence Covert presented indicates that Shreve received a second warning in October, 2005 and a third warning in April, 2006.  However, the conduct for which Shreve was warned is not comparable to Covert's conduct.  Shreve received the first warning after telling Truax that her department did not have any blank affidavit forms, when in fact it did.  She received the second warning after taking a smoke break without first obtaining supervisor approval.  Whereas Covert's misconduct (i.e., her failure to memorialize a meeting between a child and his or her prospective family) is directed at the Department's core mission, Shreve's misconduct, like Ward's misconduct, is administrative in nature.  Two employees cannot be "similarly situated" where, as here, they were disciplined for non-comparable conduct.  See e.g., Palmer, 97 Fed. Appx. at 525.

> **2.     Failure to timely respond to sexual abuse complaint and provision of inappropriate sexual advice to alleged abuse victim**

31

With regard to her handling of the sexual abuse complaint, Covert again attempts to show pretext by disputing the facts upon which the decision to terminate was based; for example, by demonstrating that she did in fact timely respond to the complaint. See Plaintiff's Memorandum in Opposition at 12-13. Covert ignores the relevant inquiry – that is, whether the Department "honestly believed in the proffered non-discriminatory reason for its adverse action." Braithwaite, 258 F.3d at 493-94. Covert has failed to create a material dispute over whether Smith and the Commissioners made a reasonably informed and considered decision that demonstrated an honest belief in the proffered reason for Covert's termination. Indeed, the evidence indicates that at the time Covert was terminated, Smith and the Commissioners had only evidence showing Covert had not timely responded to the call. The "Report of Child Abuse or Neglect" form completed by Covert in connection with this case indicated that a face-to-face conference was held three days after the complaint was received despite the Departmental requirement that contact be initiated within 24 hours of receiving the complaint. Moreover, Covert acknowledged during her deposition that she chose not to respond to any of the disciplinary charges lodged against her, including the charge related to the sexual abuse complaint. Covert has therefore failed to demonstrate that this reason for terminating her had no basis in fact. Cf. Chandler, 2006 W 143272, *4.

Covert also attempts to show pretext by pointing to what she characterizes as favorable treatment of a "similarly situated" employee, Cassie Wells. Wells received a verbal warning and was removed from the case after it became clear that she had interceded to interview the alleged sexual abuser despite the fact that he was a close friend of Wells' son.[15]

---

15 Plaintiff also suggests that Wells was treated more favorably in that she was permitted an opportunity to explain her side of the story in a face-to-face meeting. Plaintiff, however, received notice of the pre-disciplinary hearing and chose, on the advice of her attorney, not to attend that

32

The court finds that Covert and Wells are not similarly situated for several reasons. First, Wells, in contrast to Covert, did not have twenty-two total charges of misconduct lodged against her at the time she was disciplined. Second, Wells, unlike Covert, had recently received two very positive performance evaluations – one in March, 2006 and another in June, 2006. Third, the conduct for which Covert and Wells were disciplined was not comparable. While both were found to have engaged in improper conduct, only Covert was charged with failing to timely respond to a complaint that a child was in a potentially dangerous situation and of making comments that could reasonably be viewed as encouraging sexual behavior to a nine-year old suspected abuse victim. See Covert Dep. Ex. 5, Covert notes memorializing meeting with D.J. ("I [Covert] explained to DJ that he was not in trouble but that he was too young to be doing things like this. DJ wanted to know how old he could be before he could do this (with a girl of course)[.] I stated to DJ that if he turns 13 or older and has a girlfriend the same age and she consents he could at that time.")

### 3. Involvement in the September 10, 2006 Traffic Accident

Covert argues that the Department's third articulated reason for terminating her (her involvement in the September 2006 car accident) is a pretext for retaliation.

The police report documenting the September 10, 2006 accident states that Covert drove her car off of the road and into a mailbox post. After striking the post, Covert continued operating her car through a private driveway. She unsuccessfully attempted to do a "u-turn," and her car became stuck in a ditch. See Pl. Ex. 7, at 26. The officer who completed the report concluded that Covert was likely "under the influence of medications/drugs/alcohol" at the time of the accident

---

hearing or to otherwise respond to the charges against her.

33

and indeed, Covert testified that she was under the influence of alcohol when the accident

occurred. Id. at 34; Covert. Dep. at 31. Covert was charged with "OMVI," "physical control," and

willful or wanton operation" on September 14, 2006, and in 2007, she pled guilty to the "physical

control" charge. Covert Dep. at 30-31.

Covert contends that the Department could not properly terminate her for her involvement

in this accident because as of the date of her termination (October 4, 2006) she had been charged

with, but not convicted of, an alcohol-related traffic offense. Covert directs the court to the portion

of the Department's Policies and Procedure Manual which states, any Department employee "who

is required to operate a County vehicle in the course of his employment shall be subject to the

following conditions and restrictions:….Reassignment or other appropriate personnel action in the

event of…traffic offense(s) conviction such as OMVI/DUI/OVI." Covert argues that this language

permits termination only in the case of an alcohol-related traffic conviction.

The problem with Covert's argument is that it assumes that the Department terminated her

pursuant to the above-quoted language. The evidence indicates that the Department knew of the

circumstances surrounding the accident, including the fact that Covert had been charged but not

convicted in connection with the accident, and thus, that the above-quoted Manual language was

not applicable. The Amended Notice of Pre-Disciplinary Meeting lists among the twenty-two

instances of misconduct Covert's involvement in "[e]vents regarding [the] complaint issued

September 10, 2006 at 12:15 a.m. (OMVI/under the influence of alcohol/drug [sic] abuse; Physical

control; Willful or wanton operation)." Covert Dep. Ex. 4 (emphasis added.) Despite the fact that

Covert had not been convicted, the Department determined that the circumstances (e.g., the

severity of the accident, the fact that Covert routinely drove both her car and an agency car for

34

business purposes, including to transport children, and the serious nature of the charges) warranted discipline.  Indeed, the Manual states, in the "Disciplinary Policy" section that an employee "may be…removed from their job for:  Incompetency,…dishonesty, drunkenness,…discourteous treatment of the public,…violation of state or federal law…or any other failure of good behavior." Pl. Ex. 3 (emphasis added.); see also October 2, 2006 Order of Removal (explaining that Covert's employment had been terminated as a result of Covert's "[m]isfeasance, malfeasance, nonfeasance in office, insubordination and other failure of good behavior; specifically: [f]alsification of records, failure to meet required timelines in initiating or completing investigations, inappropriate remarks to a client during an investigation and other failure of good behavior as listed in the amended notice of pre-disciplinary meeting.")(emphasis added.)  Covert has failed to show that her termination was contrary to the terms of the Department Manual.

For the above stated reasons, the court concludes that Covert has failed to raise a genuine issue of material fact with regard to the issue of pretext for termination.  The Department is entitled to summary judgment on Covert's termination claim.

### b.    Failure to Promote

The court next finds that Covert has created a triable issue regarding pretext in the context of her failure to promote claim.  First, Covert has put forth evidence which demonstrates that the Department "did not honestly believe in the proffered non-discriminatory reason for its [decision to promote Wells rather than Covert]."  Braithwaite, 258 F.3d at 493-94.  As noted above, the Department asserts that it selected Wells because she was, among other things, the more qualified candidate.  However, Covert has introduced evidence (in the form of an affidavit from Wells) demonstrating that Truax was aware at the time of the interviews that Wells did not have her

associate's degree and was misrepresenting her qualifications.  While Truax denies knowledge of Wells' true educational status at the time of the interview, the court finds that the evidence submitted by Covert is sufficient to create a genuine issue of material fact on this point.

Covert has also proffered evidence in the form of affidavit testimony from Wells and Wallace that Truax provided each of them with answers to questions that would be a part of all three candidates' interviews.  Wells was subsequently recommended for supervisor, based in part, on her superior performance during her interview. (Both Wells and Wallace received interview scores that were markedly higher than Covert's score).  Because this evidence also raises a genuine issue of material fact with regard to pretext, the court declines to grant the Department summary judgment on Covert's failure to promote claim.

### B.     Count II. - Retaliation in Violation of Ohio law

Because it is well settled in Ohio that the standard for state law retaliation claims asserted under Section 4112 of the Ohio Revised Code is the same as the standard for federal retaliation claims asserted under Title VII and related civil rights statutes, see e.g., Davis v. Omni-Care, Inc., No. 09-CV00357, 2010 WL 2196519, *7 (N.D. Ohio June 1, 2010)(citing Green v. St. Elizabeth Medical Ctr., No. 96-4308, LEXIS 456 at *14 (6th Cir. Jan. 7, 1988)), the court's analysis of Covert's claims under Title VII applies with equal force and effect to her state law claims.

### IV.    CONCLUSION

Based on the foregoing analysis, the Department's motion for summary judgment is granted in part and denied in part.

It is so ORDERED.